**CONFIDENTIAL**
No. 24-10095-P

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

KENNETH EUGENE SMITH,
*Plaintiff-Appellant*,

v.

COMMISSIONER, Alabama Department of Corrections, et al.,
*Defendants-Appellees*.

◆

On Appeal from the United States District Court
for the Middle District of Alabama
Case No. 2:23-CV-00656-RAH

## DEFENDANTS-APPELLEES' BRIEF IN OPPOSITION
## TO SMITH'S RENEWED EMERGENCY MOTION FOR STAY OF EXECUTION

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr.
  *Solicitor General*

Robert M. Overing
  *Deputy Solicitor General*

Dylan Mauldin
  *Ass't Solicitor General*

Richard D. Anderson
Beth Hughes
Polly Kenny
Henry Johnson
John Hensley
Jordan Shelton
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Appellees*

January 24, 2024

## CERTIFICATE OF INTERESTED PERSONS

In accordance with 11th Cir. R. 26.1-1(a)(3) and 26.1-2(c), undersigned counsel certifies that the certificate of interested persons included in the Supplemental Appendix Volume 1 of 4, filed on January 17, 2024, is complete.

No publicly traded companies are parties to this case.

*s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.
*Solicitor General*

**INTRODUCTION**

Kenneth Smith was given ample opportunity to prove entitlement to the extraordinary relief of a preliminary injunction, and he was even given a do-over, being granted the extraordinary chance to add additional evidence to the record after this Court held oral argument on January 19—even though much of that evidence predated oral argument and some of it even predated Smith's notice of appeal. The district court's decision to deny Smith's preliminary injunction a second time confirms that Smith's claim lacks any merit.

Since 2022, he has demanded nitrogen hypoxia as "his preferred method of execution." DE69:14-15.[1] After the State finalized its Protocol for carrying out the method, Smith faced the "heavy burden" (DE69:35) of showing that he is "sure or very likely" to suffer severe pain that would be significantly reduced by a feasible and readily available alternative. *Glossip v. Gross*, 576 U.S. 863, 877 (2015). He failed before and has failed again.

Smith's renewed motion for a stay relies on misrepresentations of the record and improperly asks this Court to reweigh the evidence de novo. He claims that his accounts of vomiting are "corroborated" because medical staff at the prison have treated him for nausea and vomiting, but the records simply show that they provided

---

[1] "DE" citations refer to the district court docket. "Doc." citations refer to this Court's docket.

that treatment based on "Smith's self-reporting." 2d Stay Mot. 5. Smith's lawyer telling the Court that Smith told him he is vomiting is likewise just more self-reporting from Smith. And, in any event, neither the district court's first nor it second denial of Smith's preliminary injunction motion turned on whether he has vomited.

Smith then resorts to making up facts out of whole cloth, asserting that there is "evidence" of "continuous vomiting." 2d Stay Mot. 4. That citation-free statement is false. As the district court noted, "taking the medical records in which Smith complains of nausea and vomiting as written, he has experienced '*intermittent*' nausea and vomiting," not *continuous* vomiting. DE88:2 (quoting DE87-4) (emphasis added). That Smith must resort to made-up evidence underscores his failure to prove his case.

Smith asserts that "ADOC does not dispute the facts reported by Mr. Smith about his vomiting," Doc.55:5, but it is far from clear that Smith's self-reporting is true. He has an obvious incentive to invent reports of vomiting, and he was purportedly vomiting *before* he filed his notice of appeal, yet no court heard about it until his lawyer's rebuttal during oral argument before this Court. In any event, "there is no evidence concerning when exactly, the number of times, and how close in time to Smith eating solid food or drinking liquids the vomiting occurred." DE88:2.

Which brings us to Smith's final gambit—attacking the State for taking steps that his own expert agreed would reduce risks from vomiting. Previously, Smith

complained that a last meal in the afternoon would be risky, but he now suggests that moving that meal to the morning of his execution raises "new constitutional issues." Doc.55:6. Nonsense. If Smith wants to bring a conditions-of-confinement claim demanding an injunction to feed him a large meal shortly before his execution while he is allegedly vomiting nonstop, he can amend his complaint. But steps taken by Defendants that serve only to alleviate Smith's speculative (but persistent) concerns do not in any way strengthen his case for a stay of execution.

In sum, when viewed as a whole, the new evidence corroborates, rather than undermines, the district court's findings. Smith has never grappled with the fact that he needs to show a substantial risk of not just one (unlikely) event, but five. And new evidence bearing on one of those events (the likelihood that Smith vomits at all) does not show a probability of his speculative and hyperbolic chain of events. The applicable standard, which Smith has never contested, is whether he is "sure or very likely" to suffer severe pain that would be significantly reduced by a feasible and readily available alternative. *Glossip*, 576 U.S. at 877. Smith failed to carry that burden. The new evidence makes no difference.

Some additional developments, however, do further undermine Smith's Equal Protection Clause claim. First, the Supreme Court this afternoon denied certiorari in Smith's second state postconviction proceeding, thereby exhausting his appeals. Thus, Smith's claim, which requests "a stay of execution pending completion of Mr.

Smith's appeals," is now moot. DE31:34. And his briefing in that case confirms that *Rooker-Feldman* and preclusion would apply if the claim were still live.

Finally, Smith's recent delays and latest filing make a mockery of the judicial process. Much of his evidence "could have been brought" to a court's attention "earlier" and reflect the "applicant's attempt at manipulation," which is itself "grounds for denial of a stay." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019).

## BACKGROUND

Smith alleges that he has had chronic nausea since the November 17, 2022 execution attempt. Although his expert Dr. Porterfield provided an exhaustive analysis of his condition, she did not report that Smith ever vomited. Indeed, she testified at the preliminary-injunction hearing that Smith had never reported any vomiting whatsoever. *See* DE67:143:16-20, 144:12-14. Nonetheless, the claim that Smith will vomit at the critical moment became one of the cornerstones of Smith's case at the hearing, *see* DE69:36, and later on appeal, *see* Blue.Br.36-40.

On January 10, 2024, the district court denied Smith's motion for a preliminary injunction. The court determined that Smith's Eighth Amendment claim rested on a "theoretical possibility," DE69:39, which did not show a risk "sure or very

likely" to happen, *Glossip*, 576 U.S. at 877.[2] In fact, Smith's fears will materialize "only if a cascade of unlikely events occurs":

> For example, Smith eating a sufficiently large meal at a time sufficiently close to the execution which, together with his anxiety and/or PTSD, results in him vomiting a sufficient volume of stomach contents into the mask after nitrogen has been introduced that in turn clogs his airways or impacts the performance of the mask and requires the execution team to intervene and interrupt the flow of nitrogen.

DE69:42 & n.13. The district court denied Smith's motion, finding that "no one could state with any certainty the likelihood that Smith will vomit," "when, where, or how much he might vomit," or any "foundation upon which any such likelihood of vomiting would be based." *Id.*

The Court held oral argument in this case on January 19, 2024, at 3:30pm Eastern. Smith's counsel revealed in rebuttal that Smith "has been vomiting for about a week." Oral Arg. at 1:17:25, *Smith v. Commissioner*, No. 24-10095 (11th Cir. Jan. 19, 2024). By email to the State's trial counsel that day, Smith's counsel also stated that Smith has been vomiting "*over the past two weeks*"—i.e., as far back as January 5. Ex. B. to DE77-2 (emphasis added). Smith later introduced evidence in the district court that he had vomited as early as December 24, 2023—one month ago. *See* Porterfield Declaration, DE87-5:2. Smith made no attempt to explain or excuse his delay in bringing this evidence to the district court's or this Court's

---

[2] Smith has never contested that the Supreme Court's Eighth Amendment jurisprudence requires a harm that he is "sure or very likely" to suffer.

attention, although his counsel stated that he learned of it on January 18, 2024. *See* Ex. 1 to Doc.47.

Smith delayed adjudication by improperly raising his new evidence in a Rule 28(j) letter that provided no authority for how or why the Court should the new evidence. Doc.41. This Court construed Smith's notice as a motion to supplement, which the Court denied. *See* Doc.42. At the same time, the Court permitted Smith to seek relief in the court below. *Id.*

Smith then moved in the district court to supplement the record, DE83:1, but again "cited no authority" for why the court could accept his evidence. DE83:2. Nonetheless, without Smith asking, the district court issued "an indicative ruling that it would grant Smith's motion … if the Eleventh Circuit remanded for that purpose." *Id.*

Smith then moved this Court again for leave to supplement the record with the earlier evidence, and he also improperly included for the first time a supplemental declaration from Dr. Yong dated January 22, 2024, which was not before the district court when it made its indicative ruling. Doc.42:2.

This Court granted "Smith's motion for limited remand to the district court for the limited purpose to entertain Smith's motion to supplement the record." Doc.51-1:2. And it asked that the district court "determine whether the new evidence would change" factual findings or legal conclusions from this Court's order denying

Smith's preliminary injunction request. Doc.51-1:2-3. It specified that the district court could allow the State to submit new evidence in response. Doc.51-1:3.

On remand, Smith moved to supplement the record with his attorney declarations, his medical records, and Dr. Yong's declaration. And Smith *again* presented never-before-seen evidence—a declaration from Dr. Porterfield who opined on Smith's medical records. DE87-5.

The State also moved to supplement the record with a sworn declaration from Warden Raybon. *See* DE88:1. As the warden explained, Smith's last meal will take place at least eight hours before the execution time, and Smith will not be permitted to consume liquids within two hours prior to the execution time. *See* DE88-2.

The district court granted both motions, but it was "reluctant[]" to allow the declarations from Dr. Yong and Dr. Porterfield because (1) neither was included in Smith's earlier motions to supplement in that court and (2) neither was subject to the court's indicative ruling. DE88:2. Those declarations were "last-minute" and "could have been presented more than a week ago." *Id.*

Reviewing Smith's attorney declarations and medical records, the court was not impressed. Evidence that Smith was vomiting "is based entirely on his own personal reports" and had "not been corroborated by anyone else." DE88:2. Even taking the records at face value, Smith's vomiting had been only "intermittent" over a period of weeks, *id.*, (and not "continuous" as he now avers, Doc.55:8). Moreover,

"there is no evidence concerning when exactly, the number of times, and how close in time to Smith eating solid food or drinking liquids the vomiting occurred." DE88:2.

> "As before," Smith's claim relies on "a cascade of unlikely events" in which:
>
> Smith in fact vomits during the execution, precisely between the time nitrogen begins to flow and before he reaches unconsciousness, vomit remains in his mouth and throat in a sufficient volume to block his airway such that he chokes or otherwise experiences severe pain prior to his loss of consciousness or death by nitrogen hypoxia.

DE88:3. Even with Smith's new evidence the court found no reason to believe that Smith is "sure or very likely" to experience his alleged harm; all his evidence is "broad and non-specific" because it goes to vomiting generally, when Smith has alleged a very specific vomiting scenario. *Id.* And Dr. Yong's and Dr. Portfield's views on the likelihood of the harm were "undermined by Raybon's declaration concerning the time between Smith's last meal and his execution." *Id.* In other words, the State will "implement *just what Smith previously argued the Protocol lacked*: a nothing-by-mouth order." *Id.*

Finally, Smith's claim still fails at the second prong—a feasible and readily available alternative that would significantly reduce the risk. Nothing in the "new evidence," explained the district court, "show[ed] such risk would or could be significantly reduced by Smith's alleged alternative methods of execution." *Id.*

8

## REASONS TO DENY THE MOTION

### I.    Smith's Eighth Amendment Claim Fails.

There was no error, let alone a clear error, in the district court finding—before and after the new evidence—that Smith's claim rests on a "cascade of unlikely events," the conjunction of which does not amount to a substantial risk. DE69:42; DE88:3. Those unlikely events include:

(1)  that Smith will vomit during the execution,

(2)  that he will vomit precisely between the time when nitrogen begins to flow and when he becomes unconscious,

(3)  that vomit will either remain in or re-enter his mouth and throat,

(4)  that his vomit will be enough to block his airway entirely, causing him to choke, and

(5)  that Smith choke to death or otherwise suffer unconstitutionally severe pain before he loses consciousness from hypoxia.

And *even then*, if Smith proves that the entire chain is "sure or very likely" to happen, *Glossip*, 576 U.S. at 877, he must still show an alternative that significantly reduces the risk. On this record, even with Smith's new evidence, this Court cannot say with firm conviction that the district court was wrong to find Smith's claim to be speculative and that it abused its discretion in denying preliminary injunctive relief.  Still, "Smith's evidence remains broad and non-specific." DE88:3.

9

## A. Smith's New Evidence is Weak and Goes Only to the Baseline Risk That He Vomits At Some Uncertain Time.

At best for Smith, the new evidence only marginally increases the likelihood that the first event occurs—that he vomits at some point during the execution proto-col. While Smith casts the evidence as undisputed, Doc.55:5, the evidence amounts to second-hand reports of Smith's own self-reporting that he has vomited on a few occasions, not "continuous[ly]" as he puts it in his motion, *id.* at 8. True, Defendants do not dispute that Smith's counsel have testified that Smith has reported vomiting. But his evidence is hardly "corroborated" because the *self-reporting*—not the *vomiting* or anything about the vomiting—was "documented by ADOC prison staff." *Id.* at 5, 8-9.

The Court still has no evidence before it about the nature of Smith's vomiting over the past month—the frequency, duration, timing, or characteristics of it. Smith states that the evidence shows he is "presently vomiting enough to be prescribed medication," Doc.55:8, but there is no evidence in the record about the medical standard for prescribing such a drug. Nor is there evidence that he was prescribed it on the basis of anything objective, *i.e.*, anything other than his self-reports. Vomiting is a condition that one would want alleviated for any reason, so the bare fact of Smith's prescription does not say much about the risk.

Smith says that Defendants have custody over Smith, so "[i]f they want to corroborate [his] self-reporting, they have the means to do that." Doc.55:9. And he

10

admits that he has no "eyewitness" evidence, for which he blames Defendants. But, again, Smith has the burdens backward. The State is not required to *disprove* his Eighth Amendment claim; Smith is required to prove it.

Moreover, when Smith allegedly began vomiting, weeks ago, he knew that such facts could be critical to his case. He had the opportunity to develop documentation, eyewitness testimony, or some other form of corroboration. Instead, he did nothing to develop that evidence. Smith's inability to prove his claim *now, hours before his execution date,* is not fairly attributable to the State and should not be excused.[3]

### B. The State's New Evidence Eliminated a Key Assumption in Smith's Vomiting Scenario.

As explained in Warden Raybon's declaration, DE86-1, Smith's last meal will be served to him eight hours before the time of execution. Thereafter, he will be given only liquids until two hours prior to the execution time. When the execution begins, there will be nothing substantial in his stomach (aside from anything consumed as part of his religious observance). As the district court found, DE88:3, the

---

[3] Although Smith's claim fails even upon consideration of all of his new evidence, the Court should not consider the evidence Smith presented after the district court's indicative ruling (Dr. Yong's declaration) and the evidence presented after this Court's limited remand (Dr. Porterfield's declaration). The district court did not contemplate either when it issued its indicative ruling, which was the basis for the remand, and this Court did not contemplate the new declaration when it remanded. The Court did not give Smith a blank check to add whatever he wanted to the record.

State's new evidence "undermine[s]" Smith's prediction that he will vomit in a way that poses harm.

*Now* Smith says that Warden Raybon's change to the schedule—ensuring that Smith has not eaten a full meal close to the execution time—"will be ineffective." Doc.55:6. He claims that the nothing-by-mouth order is "a medical procedure" that Defendants are "applying [] outside its context." Doc.55 at 9. But *Smith's counsel* first developed the expert testimony on nothing-by-mouth orders when Smith deposed Dr. Antognini. *See* DE62-35:307; *contra* Doc.55:10 n.3 (falsely stating that "Defendants first raised nothing-by-mouth orders in their cross-examination" at the hearing). And it was also *Smith's expert's testimony* that an instruction not to eat solid foods can reduce the risks of vomiting. DE67:78-79. According to Dr. Yong, a person scheduled for a medical procedure that involved anesthesia would be directed not to eat any solid foods in the eight hours before the procedure. *Id.*

When it suited his litigation purposes, Smith had no problem relying on the "medical" evidence and cited it approvingly in his post-hearing brief:

> Drs. Yong and Antognini give nothing-by-mouth orders that advise patients not to eat a full meal for eight hours before receiving anesthesia to reduce the risks of vomiting. But the Protocol provides that Mr. Smith is entitled to a "last meal." When ADOC attempted to execute Mr. Smith in November 2022, his last meal was delivered … only two hours before his scheduled 6:00 p.m. execution. Accordingly, execution by nitrogen hypoxia entails an inherent risk of nausea and vomiting.

DE65:46-47 (citations omitted). Indeed, Smith cited the last meal as one of the factors supporting the alleged substantial risk of vomiting. The underlying evidence remains undisputed, and this Court should not find clear error based on Smith's shifting positions on appeal.

Smith now argues that surgeries "generally occur in the morning," Doc.55:10, but there's no evidence that a nothing-by-mouth order imposed for an evening surgery would impose any risk with respect to vomiting.

Smith's complaint that "'nothing-by-mouth orders' do not *eliminate* the risk of vomiting" (Doc.55:14) again ignores the constitutional standard. The *State* is not required to prove the elimination of every theoretical risk, *Smith* is required to prove the existence of a risk that is "*sure or very likely* to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers." *Glossip*, 576 U.S. at 877 (quotation marks omitted). He failed.

### C. The Remainder of Smith's Scenario Is Still Speculative.

Smith's far-fetched scenario requires that he vomits during a precise window—after the nitrogen begins to flow but before he reaches unconsciousness. *See, e.g.*, DE62-53:§6.1. If he vomits before, the execution team will handle it,[4] and if he

---

[4] Ms. Stewart-Riley testified that her team has practiced procedures for dealing with vomit before nitrogen begins to flow and even simulated vomiting, removing the mask, using a bite guard to perform a finger sweep, and continuing the execution protocol. DE62-33:172, 179-80.

vomits after, he will feel no pain, DE62-67:164:18-20. If he vomits, the odds are he vomits at some other time due to the ever-present risk of vomit posed by his anxiety, chronic nausea, and "triggering" sights in the lead up to the event. *See* Doc. 55:12.

Under the Alabama protocol, the window is very small. As Dr. Nitschke stated, rapidly lowering oxygen "ensure[s] an almost-immediate loss of consciousness with death following soon after." DE62-53 §14.1. The State's method *will* rapidly lower the oxygen level in the mask, ensuring unconsciousness in seconds. Alabama's mask will reduce oxygen levels to 2% in under 45 seconds. *See* DE62-35:266; DE62-60¶24.[5]

### D. Even if Smith Vomits at the Critical Time, His Claim Fails.

Even if Smith vomits, and even if he vomits at the critical time, his claim requires that his vomit has nowhere "to go other than back into Mr. Smith's mouth and *potentially* down his airway." Smith Reply Br. at 19 (11th Cir.) (emphasis added). But he cited nothing in the record for that assertion, and it is false. Evidence showed that the volume of the mask is sizable—1.4 liters, DE62-35:160. Video

---

[5] The risk of death is so high that OSHA reports contain some fifty cases of workplace fatalities due to accidental hypoxia. *See* DE62-60¶29; *see, e.g.*, DE62-95 through DE62-100. OSHA warns that "unconsciousness can occur in about 12 seconds." DE62-83:2. Smith's counsel stated that one of the subjects of the Ogden (2010) study "took forty minutes to become unconscious and die," Oral Arg. at 1:20:15, but she was committing suicide without assistance, using a cheap mask with visible gaps, and, contrary to Smith's counsel's description, became unconscious (and therefore insensate) in *55 seconds*. DE62-95:177.

evidence also showed (a) that individuals strapped to the gurney are lying at an incline, and (b) that they can lift their heads and move their heads from side to side. *See, e.g.*, DE62-106; DE62-73; DE62-79. The video at DE62-106 is filmed from the side of the gurney and clearly shows that the volunteer is lying not prone on his back, but at an incline, and that he can lift up his head and torso further still—almost as if seated in a chair.

Smith's only response (below) was to claim that some other evidence is needed to show that the gurney's incline will reduce risk. DE87:7. But it was Smith's counsel who asserted that the vomit risk is created by wearing a mask "[i]f you're lying prone." Oral Arg. at 1:18:55 (11th Cir.). Smith's speculation that vomit would flow back into his mouth assumes facts not in evidence (and, in fact, belied by the evidence). There is no substantial risk that vomit will fill up the 1.4 liter mask such that it will return to Smith's throat and cause him severe pain. Vomit would have other places "to go" and would not cause severe pain by clogging the inmate's throat.

But even if Smith vomits at the critical time and the vomit has nowhere "to go," his claim requires that the vomit "completely fill[s] up the airway," DE62-35:308. Still, even with his new evidence, Smith has not proven this assumption of his scenario, which requires that a certain kind of vomit of a certain volume that he could not expel from his throat and mouth.

15

In    response,    Smith    stated    in    the    district    court    that    he "cannot possibly know anything about the characteristics of future vomit or his ability to expel vomit." DE87:7. Exactly. That admission ends his claim. Smith has not shown a "sure or very likely" risk of severe pain.

### E.  The Contemplated Pain is Not Unconstitutionally Severe.

Even if the entire cascade of unlikely events materializes, Smith must show that he will choke to death or otherwise suffer unconstitutional pain. But he has not shown that choking on vomit is the type of pain that an inmate sentenced to death is entitled to avoid. Other permissible methods of execution involve some amount of pain. *See Bucklew*, 139 S. Ct. at 1124 (describing hanging). Smith's own proposed alternative—*the firing squad*—involves tearing his organs apart with bullets while he's still conscious. This Court should not reverse on the fact-bound determination, unsupported by anything in the record, that the negligible risk of some pain from vomiting outweighs the pain of being shot to death.

### F.  Smith Still Has No Real Alternative That Would Significantly Reduce the Risks He Alleges.

Even if Smith's claim clears every hurdle above, it still fails for want of an alternative that would significantly reduce risk. *See Nance*, 597 U.S. at 169 (requiring a "veritable blueprint"). He has no method that would reduce his baseline risk of vomiting, which is allegedly caused in part by anxiety (Ex. 5 to Doc.47), and nothing about his new evidence speaks to the alternatives.

16

As Dr. Yong testified, DE67:77, and the district court found, DE69:38, nausea is a symptom of hypoxia regardless of the method. Defending a hood, Smith says that "the vomit can leave the hood," Oral Arg. at 1:18:40 (11th Cir.). But Smith has not described the method with any particularity—how big, how tight, how secure the hood would be—so there is no factual basis for his comparison. And his argument that vomit would just "leave" contradicts his position (*see, e.g.*, *id.* at 1:18:55) that the inmate's position on the gurney is part of the reason he would choke.[6] Smith's own expert averred that "vomiting would still be a possibility" with any alternative. DE62-53:8-9.

## II.    The Court Should Refuse Injunctive Relief on Smith's Late-Breaking "Corporal Punishment" Claim.

Smith's latest maneuver is to assert a new Eighth Amendment claim for the first time in his motion for an emergency stay. Doc.55:11. Yet he has no authority to support injunctive relief or a stay on a claim absent from his complaint. The claim was not adjudicated below. Smith did not raise the issue in the district court, instead waiting over sixteen hours to raise it in this Court. Smith's latest in a string of late-breaking attempts to delay his lawful sentence should be rejected out of hand.

---

[6] If the hood has holes large enough to allow vomited material to pass through, then it can't be "sealed," which has been Smith's complaint about the mask from the beginning. *See* DE31¶85. Smith's claim makes no sense: He demands a method that would somehow seal in gas but let out vomit.

Even on the merits, Smith says little of substance. To be sure, the Eighth Amendment requires the State to "provide prisoners with reasonably adequate food," *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1572 (11th Cir. 1985), but the State "does not violate the Eighth Amendment by feeding a prisoner a minimal amount of food for a limited number of days." *Hernandez v. Fla. Dep't of Corr.*, 281 F. App'x 862, 865 (11th Cir. 2008) (citing *Novak v. Beto*, 453 F.2d 661, 665, 668 (5th Cir.1971)).

Indeed, Smith quotes *Chavarriaga v. New Jersey Dep' of Corr.*, for the proposition that "prison officials violate an inmate's Eighth Amendment rights when they deprive her of 'a single identifiable human need such as food, warmth, or exercise,'" but conveniently omits the very next sentence: "But an inmate's claim that she was subjected to such a deprivation does not rise to the level of an Eighth Amendment violation unless ... the prison official deprived the prisoner of the minimal civilized measure of life's necessities." 806 F.3d 210, 226 (3d Cir. 2015).[7] That does not support Smith's claim that, while doctors routinely impose nothing by mouth orders overnight, Doc.55:6, the Constitution somehow forbids those orders during the day. Nor does it support his argument that the amount of time that the order *could* prevent him from eating or consuming water might violate the constitution. *See Williams v.*

[7] Smith's other case, *Cooper v. Sheriff, Lubbock Cnty., Tex.*, 929 F.2d 1078 (5th Cir. 1991), is no more helpful, especially because the inmate "specifically asserted that he was denied food on December 30, 1989, and again for five consecutive days from January 10, 1990, through January 15, 1990," *id.* at 1081.

*Shah*, 927 F.3d 476, 480 (7th Cir. 2019) (amount and duration of deprivation are critical). At bottom, the State is not punishing Smith; it is addressing *Smith's* fears about what will occur during his execution. Smith raising this issue at this stage—and especially in such cursory fashion—make clear that this case is all about delay, not finding a path forward.

Finally, even if Smith had some likelihood of success on this claim, it could not warrant a stay of execution, as it has nothing to do with the execution itself. Smith's complaint about his treatment leading up to the execution does not support his Eighth Amendment claim alleging that the State's nitrogen hypoxia protocol is Cruel and Unusual. At most, the relief required to remedy Smith's alleged harm would be a very narrow order setting some other final meal schedule. If he wants to bring that claim, he needs to amend his complaint and back it up with legal authority.

## III.   Smith's Equal Protection Claim Is Now Moot.

Smith's Equal Protection Claim is based on the premise that he was treated differently because he is set for execution even though he had pending an appeal "from the dismissal of a non-frivolous state postconviction petition," while "other condemned people in Alabama who elected to be executed by nitrogen hypoxia when that option was made available to them in 2018 have exhausted their appeals." DE31¶6. He requested a "preliminary and permanent injunction prohibiting Defendants from executing Mr. Smith by nitrogen hypoxia until he has exhausted his

pending appeals or, alternatively, a stay of execution pending completion of Mr. Smith's appeals." DE31:34.

As of earlier this afternoon, Smith's appeal of his state postconviction petition has ended. In *Smith v. Alabama*, No. 23A664, the Supreme Court denied Smith's application for a stay in that case and denied his petition for a writ of certiorari. There is thus no need to grant him "a stay of execution pending completion of Mr. Smith's appeals," because they are completed.

Separately, if Smith's claim is not moot, it remains precluded by his earlier litigation—as Smith admitted to the Supreme Court just yesterday: "[I]t is undisputed that [Smith] separately opposed the setting of an execution date in the Alabama Supreme Court on the ground that setting a date would be premature while this post-conviction proceeding was pending." Reply at 4, *Smith v. Hamm*, No. 23A664 (U.S. filed Jan. 18, 2024). Smith explained to the Supreme Court that he had already "litigated the issues" in the Alabama Supreme Court and received a merits determination. *Id.*

## IV.    Smith Is Not Entitled to Extraordinary Equitable Relief.

The Supreme Court has instructed the judiciary to "police carefully against attempts to use such challenges as tools to interpose unjustified delay." *Bucklew*, 139 S. Ct. at 1134. Smith is scheduled to be executed on January 25, 2024, for a murder he committed in 1988. The district court entered its order denying the

preliminary injunction on January 10, 2024, yet it was *the State* that moved to expedite this appeal two days later when Smith had not requested any similar relief. *See* Doc.7. And then it was not until Smith's rebuttal during oral argument that he informed the Court of his new evidence, some of which *predates* the district court's preliminary injunction order. *See, e.g.*, DE87-5 (Porterfield declaration interpreting medical reports to disclose vomiting on December 24, 2023); Doc.47 at 38 (showing a "Chronic Disease Clinic Follow-Up" form from January 9, 2024 that reflects Smith's complaint of vomiting); *see also* Doc.41 at 12 (January 19, 2024 email from Smith's counsel stating that Smith "has been experiencing symptoms *over the past two weeks*") (emphasis added).

"The answer is not … to reward those who interpose delay," *Bucklew*, 139 S. Ct. at 1134, but rather to deny Smith's futile and belated request.

## CONCLUSION

The Court should deny Smith's renewed motion.

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr.
  *Solicitor General*

Robert M. Overing
  *Deputy Solicitor General*

Dylan Mauldin
  *Ass't Solicitor General*

Richard D. Anderson
Beth Hughes
Polly Kenny
Henry Johnson
John Hensley
Jordan Shelton
    *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.

Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

January 24, 2024                    *Counsel for Appellees*

**CERTIFICATE OF COMPLIANCE**

1.    I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 27(d)(2)(A). This brief contains 5,137 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f).

2.    In addition, this response complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

<div style="margin-left:40%;">

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Appellees*

Dated: January 24, 2024

</div>

## CERTIFICATE OF SERVICE

I certify that on January 24, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record including:

Robert Grass: Robert.Grass@arnoldporter.com

Andy Johnson: AJohnson@bradley.com

<div align="right">

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Appellees*

</div>