[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10095

_____

KENNETH EUGENE SMITH,

Plaintiff-Appellant,

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,
WARDEN, HOLMAN CORRECTIONAL FACILITY,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:23-cv-00656-RAH

2                    Opinion of the Court                    24-10095

_____

Before WILSON, JILL PRYOR, and GRANT, Circuit Judges.

PER CURIAM:

Kenneth Eugene Smith is a death row inmate in the custody of the Alabama Department of Corrections (ADOC) at William C. Holman Correctional Facility (Holman).  Smith is set to be executed on Thursday, January 25, 2024, for the second time.  In its first execution attempt, Alabama failed to obtain intravenous (IV) access necessary to complete the lethal injection.  Now, Alabama plans to use nitrogen hypoxia for the first time.

Smith sued ADOC Commissioner John Hamm and Holman Warden Terry Raybon (collectively, Defendants), asserting violations of the First, Eighth, and Fourteenth Amendments, the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, and the Alabama Constitution's Religious Freedom Amendment (ARFA), Ala. Const. art. I, § 3.01.  Smith also asked for a preliminary injunction to stop the scheduled execution. The Defendants moved to dismiss the complaint and opposed the request for an injunction.  Although the district court found that Smith alleged plausible claims under the First and Eighth Amendments, RLUIPA, and ARFA, Smith failed to show a substantial likelihood of success on those claims to warrant a preliminary injunction.

After careful review and with the benefit of oral argument, we affirm the district court.

# I.    Background

On June 24, 2022, Alabama moved to set Smith's execution date for the murder of Elizabeth Sennet.[1]  On September 30, 2022, the Supreme Court of Alabama granted Alabama's motion and set Smith's execution for Thursday, November 17, 2022.

On August 18, 2022, Smith sued Hamm and ADOC, asserting two Section 1983 claims—violations of the Eighth and Fourteenth Amendments.  Hamm and ADOC moved to dismiss Smith's complaint, and the district court granted the dismissal with prejudice.  Smith moved to amend the judgment to a dismissal without prejudice, and alleged that ADOC's "[u]se of [the lethal injection p]rotocol" would subject him to an Eighth Amendment violation because, "as ADOC implements it," he would likely be subject to cruel and unusual punishment because of particular physiological predispositions.  The district court denied Smith's motion, explaining that, to support an Eighth Amendment violation, Smith had to show how ADOC's deviations—or how implementation of its

---

[1] In April 1996, a jury convicted Smith of capital murder based on the robbery and murder of Elizabeth Sennett.  *Smith v. State*, 908 So. 2d 273, 278 n.1, 279 (Ala. Crim. App. 2000).  Ultimately, the jury recommended by a vote of 11 to 1 a sentence of life imprisonment without the possibility of parole.  *Id*. at 278.  The trial judge overrode the jury's recommendation and sentenced Smith to death.  *Id*.  But in 2017, Alabama amended its law to no longer permit judicial override in capital cases.  *See* Ala. Code § 13A-5-47(a) ("Where a sentence of death is not returned by the jury, the court *shall* sentence the defendant to life imprisonment without parole.") (emphasis added). But Alabama has not made that statute retroactive, so Smith's death sentence still stands.

lethal injection protocol more broadly—subjected Smith to a sub-stantial risk of serious harm, and Smith failed to do so.

Smith timely appealed and sought to stay his execution pending his appeal.  We reversed the district court.  A majority of the panel found that Smith pled sufficient facts to plausibly support an Eighth Amendment method-of-execution claim that was not barred by the applicable statute of limitations.  Because we resolved Smith's underlying appeal, we denied as moot his motion for stay of execution pending appeal.  We expedited the mandate so that Smith's case could proceed in the district court.

On November 17, 2022, Smith filed an amended complaint and moved for a preliminary injunction.  Smith also sought an emergency motion to stay his execution.  Ultimately, the district court denied Smith's request for a preliminary injunction and stay of execution finding that Smith inexcusably delayed in seeking these requests.  Smith again appealed to this court and moved to stay his execution.  The panel unanimously granted Smith's request for stay at approximately 8:00 PM CST.  Before the stay was entered, Smith was taken to the execution chambers.

Smith remained strapped to a gurney in the execution chambers while Alabama's Office of the Attorney General asked the Supreme Court of the United States to allow the execution to proceed.  Smith was not told that his case had been stayed.  At approximately 10:00 PM CST, the Supreme Court vacated our stay without any explanation.  But the execution team could not obtain IV

access before the expiration of the death warrant. At approximately 11:30 PM CST, ADOC called off the execution.

The case returned to the district court where Smith moved to amend his complaint to include related failed execution claims and add new defendants. In his second amended complaint, Smith detailed the almost four hours that he spent on the gurney in the execution chamber. Smith asserted three claims: (1) an Eighth Amendment violation that a second execution attempt by lethal injection would constitute cruel and unusual punishment; (2) an Equal Protection violation by seeking a second attempt to execute Smith despite not doing the same for another inmate whose execution failed; and (3) a violation of court order to not deviate from ADOC's lethal injection protocol related to Smith's failed execution.

ADOC then moved to dismiss the complaint, but the district court denied in part the motion to dismiss and allowed Smith's Eighth and Fourteenth Amendment claims to proceed. Specifically, the district court found that Smith plausibly alleged an Eighth Amendment claim, noting:

> given Smith's allegations that he himself experienced severe pain during a prior execution attempt, and that the prior execution attempt was the latest in an ongoing pattern of the State's difficulties in establishing venous access when attempting to carry out lethal injection executions, it is plausible, rather than merely possible, that a second lethal injection execution poses a substantial risk of severe pain to Smith.

6                       Opinion of the Court                    24-10095

ADOC then answered, and the court directed the parties to develop a case management report under Rule 26.  On August 24, 2023, the district court entered a scheduling order and set an initial disclosures deadline for August 29, 2023.  On August 25, 2023, ADOC moved to dismiss because Hamm determined that nitrogen hypoxia was available as a means of execution and agreed that lethal injection would not be used in any future attempts to execute Smith.  Smith opposed—he agreed with the injunction to prevent a second execution using lethal injection, but objected to the use of nitrogen hypoxia without the opportunity to review ADOC's protocol to ensure it met constitutional requirements.  Based on ADOC's representations, the district court granted its motion to dismiss and entered a permanent injunction barring it from using lethal injection to execute Smith.

On August 25, 2023, Alabama's Office of the Attorney General sought authorization from the Alabama Supreme Court to execute Smith by nitrogen hypoxia.  Over Smith's objection, on November 1, 2023, the Alabama Supreme Court granted the motion and ordered the Commissioner to carry out the death sentence. On November 8, 2023, the Governor set Smith's execution for a thirty-hour time frame beginning January 25, 2024.

That same day, Smith filed this action with the district court against Hamm and Raybon, alleging that ADOC's nitrogen hypoxia protocol (Protocol) and Alabama's selection of him to be the first inmate executed by this method violate several constitutional and statutory provisions.  Smith moved to preliminarily enjoin

Hamm and Raybon from executing him under the present Protocol. They moved to dismiss.

On December 20, 2023, the district court held a hearing on Smith's injunction motion, where the court reviewed 111 exhibits, expert witness declarations, case reports, medical articles, videos of individuals wearing the mask, the mask itself, and various witnesses testifying to the Protocol's potential ramifications. On January 10, 2024, the district court granted in part the Defendants' motion to dismiss, dismissing Smith's Fourteenth Amendment claim, but denied the motion as to the remaining counts, allowing those claims to proceed. Ultimately, the district court denied Smith's motion for preliminary injunction.

The order organized Smith's claims into Counts One (Fourteenth Amendment), Two (Eighth Amendment), Three (First Amendment), Four (RLUIPA), and Five (ARFA). The district court dismissed Count One, where Smith alleges that his right to equal protection under the Fourteenth Amendment was violated when "the State chose [him] to be the first condemned person to be subject to execution" by nitrogen hypoxia despite his pending state collateral appeal and an Alabama custom that waits for exhaustion of all conventional appeals. The district court found that Smith lacked standing because Hamm and Raybon, as the named defendants, lack authority to select inmates and set execution dates under Alabama law. Since neither Hamm nor Raybon held decisional authority to select Smith, the district court concluded "Count One

suffers from traceability and causation infirmities that require its dismissal."

As to the remaining counts, the district court held that Smith properly pled plausible claims as to the remaining counts. Turning to Count Two, the district court concluded that Smith sufficiently alleged an Eighth Amendment method-of-execution claim because taking the allegations as true, the Protocol could increase time to unconsciousness, presents imminent dangers to superadd pain (e.g., a persistent vegetative state, stroke, vomiting, or sensation of suffocation), and two feasible, readily implemented alternative methods exist (i.e., an amended Protocol with ten proposed changes or death by firing squad using Utah's execution protocol). Turning to Count Three, the district court concluded that Smith sufficiently alleged a First Amendment free speech claim because no "compelling government interest" justifies masking Smith for his final statement, so the Protocol's burden on speech is not reasonably related to a legitimate penological interest. On Count Four, the district court determined that Smith plausibly pled a RLUIPA violation: audible prayer (1) comes from a long history of traditional religious exercise at prisoners' executions, (2) is part of his sincere religious beliefs, and (3) substantially burdens his exercise by forcing "the untenable choice of either praying audibly or risking the consequences of dislodging the mask." The district court also held that "Smith has also necessarily pled a plausible First Amendment free exercise claim" because RLUIPA "embeds a heightened standard for government restrictions of the free exercise of religion." Finally, the district court found a plausible claim

under ARFA because, although requiring strict scrutiny similar to RLUIPA, the statute dramatically lowers the threshold from "substantial burden" to "*any* burden—even an incidental or insubstantial one." Therefore, Smith's pleading under RLUIPA more than satisfied a claim under ARFA.

However, the district court ultimately denied Smith's motion for a preliminary injunction against his execution under the Protocol. The court held that Smith failed to show a substantial likelihood of success on the merits under the Eighth Amendment, RLUIPA, and ARFA.[2] First, the district court concluded that Smith's Eighth Amendment claim failed because "there is simply not enough evidence to find with any degree of certainty or likelihood" that the possibility of the mask dislodging or Smith choking on his own vomit will occur—therefore, "only if a cascade of unlikely events occurs" would execution under the Protocol superadd pain or prolong death. Second, the district court rejected Smith's RLUIPA claim because ADOC "provided substantial evidence that the mask will not dislodge if Smith audibly prays during his execution," obviating any untenable choice between audibly praying and prolonging death. Third, the district court determined that Smith's ARFA claim failed for similar reasons—Smith failed to show "there

---

[2] Smith's First Amendment claims under Count 3 were not considered because Smith did not seek a preliminary injunction based on those grounds. And, because Smith's Fourteenth Amendment claim under Count 1 was dismissed, it was also not considered in the preliminary injunction analysis.

is likely to be *any* burden on his ability to audibly pray during his execution," because the evidence "strongly shows the opposite."

Smith timely appealed and sought a stay of execution. This court set the case for expedited briefing and oral argument. At oral argument on January 19, 2024, Smith's counsel informed the panel that Smith had started to vomit as his execution date approached and he had been seen by medical professionals at Holman. That evening, Smith filed a "Notice of Supplemental Evidentiary Submission." The panel construed the filing as a motion to supplement the record and denied that request without prejudice to seek relief in the district court. On January 20, 2024, Smith moved in the district court to supplement the record with Smith's counsel's affidavit regarding Smith's new physical symptoms. On January 22, 2024, the district court denied Smith's motion to supplement the record but explained that:

> Pursuant Federal Rule of Civil Procedure 62.1(b), Smith shall notify the Eleventh Circuit's clerk of court of this court's indicative ruling that it would grant his motions to supplement the record as currently presented if the Eleventh Circuit remanded for that purpose.

On January 23, 2024, Smith moved again in this court to supplement, or in the alternative, for limited remand. We granted his motion and remanded for the limited purpose of entertaining Smith's motion to supplement the record and permitting the State to submit additional evidence in response to Smith's new evidence.

We asked the district court to determine whether the newly submitted evidence would change the previous factual findings or conclusions of law in its January 10, 2024 order denying Smith's request for a preliminary injunction.

Once we remanded, the district court ordered the parties to file their motions to supplement and argument on how to interpret the new evidence. Both parties filed motions to supplement. Smith presented his recent medical records about his vomiting and supplemental declarations from Dr. Yong and Dr. Porterfield, indicating that the new medical records demonstrate that Smith is likely to vomit during his execution, along with declarations from his counsel. The Defendants provided an affidavit from Warden Raybon stating Smith would receive his last meal at 10:00 a.m. and would not consume liquids after 4:00 p.m.

The district court reviewed this new evidence and found as follows:

> Even in light of the new evidence, the court cannot conclude the Defendants' method of execution creates a "substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purpose of the Eighth Amendment," or that Smith identified "an alternative that is feasible, readily implemented, and in fact significantly reduce[s][the] risk of severe pain" he alleges he will suffer if he becomes nauseous or vomits during the execution.

The case returned to us, and Smith renewed his motion to stay his execution, arguing that with this new information, he is likely to show a success on the merits of his Eighth Amendment claim.

Turning to the remainder of Smith's appeal, Smith argues that the district court erred in dismissing his Fourteenth Amendment claim. Smith argues the district court abused its discretion in denying him a preliminary injunction on his Eighth Amendment claim and RLUIPA claims.[3] Last, Smith argues that the district court abused its discretion in two of its evidentiary rulings.

First, we will address Smith's argument about the dismissal of his Fourteenth Amendment claim. Then we will turn to his arguments about the denial of a preliminary injunction and the evidentiary issues associated with that order. Last, we will address Smith's motion to stay his execution.

## II.    Motion to Dismiss

"We review the grant of a motion to dismiss under Rule 12(b)(6) *de novo*, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022). Similarly, we review a district court's standing determinations de novo. *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1112 (11th Cir. 2021). We first address our jurisdiction over Smith's Fourteenth Amendment claim. We have jurisdiction

---

[3] In his reply brief, Smith explicitly drops his ARFA claim as it relates to his preliminary injunction argument.

to consider Smith's Eighth Amendment and RLUIPA claims under 28 U.S.C. § 1292(a)(1), as this is an appeal from an order denying a preliminary injunction based on those claims. Further, we may extend our review to Smith's Fourteenth Amendment claim since it was "[a]n integral part of the District Court's denial of the preliminary injunction." *Speer v. Miller*, 15 F.3d 1007, 1010 (11th Cir. 1994). Since the Fourteenth Amendment served as an integral ground of Smith's preliminary injunction request, we exercise jurisdiction over this claim.

In order to bring a particular claim in federal court, the petitioner must have standing. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). Standing requires (1) an injury in fact that (2) is fairly traceable to the defendant's actions and is (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The second requirement demands that the injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* at 560 (cleaned up).

Smith challenges the district court's conclusion that he lacks standing because his Fourteenth Amendment injury "suffers from traceability and causation infirmities that require its dismissal." He argues that nothing in Alabama law expressly authorizes the Attorney General to select condemned people for execution. But testimony in the record confirms the Attorney General's primary role in selecting condemned inmates and serving as the final confirmation for an execution to proceed during the course of Alabama's

execution process. Without the Attorney General's actions, neither Hamm nor Raybon may proceed with their duties under Alabama Code § 15-18-82(b) and (c). Rather, Smith's execution selection injury is directly traceable to the Attorney General. As a result, Smith's Fourteenth Amendment injury fails on traceability grounds, and therefore he lacks standing to raise this claim.

### III.    Motion for Preliminary Injunction

"A movant is eligible for a preliminary injunction or a stay of execution only if he establishes that (1) he has a substantial likelihood of success on the merits, (2) he will suffer irreparable injury unless the injunction or stay issues, (3) the injunction or stay would not substantially harm the other litigant, and (4) if issued, the injunction or stay would not be adverse to the public interest." *Barber v. Governor of Ala.*, 73 F.4th 1306, 1317 (11th Cir. 2023). The first factor is considered one of "the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). When a court concludes that the movant fails to establish a substantial likelihood of success on the merits, "it [is] unnecessary" for the court to determine whether the movant "satisfied the second, third, or fourth factors." *Grayson v. Warden, Comm'r, Ala.*, 869 F.3d 1204, 1238 n.89 (11th Cir. 2017).

"Our standard of review on appeal is deferential, and we ask only whether the district court abused its discretion" in either denying or granting a preliminary injunction. *Reeves v. Comm'r, Ala. Dep't of Corr.*, 23 F.4th 1308, 1320 (11th Cir. 2022). "In so doing, we review the findings of fact of the district court for clear error and legal conclusions *de novo*." *Scott v. Roberts*, 612 F.3d 1279, 1289 (11th

Cir. 2010). "This scope of review will lead to reversal only if the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005) (per curiam).

The abuse of discretion standard "recognizes the range of possible conclusions the [district court] may reach." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc). It "allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." *Id.* (quotation marks omitted). Thus, under the abuse of discretion standard, we may not reverse "'simply because we are convinced that we would have decided the case differently.'" *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1323 (11th Cir. 2019) (quoting *Glossip v. Gross*, 576 U.S. 863, 881 (2015)).

Smith argues that he has established a substantial likelihood of success on the merits, and that the district court abused its discretion by denying him a preliminary injunction on his Eighth Amendment and RLUIPA claims. Smith also asserts that the district court abused its discretion in two of its evidentiary rulings related to its preliminary injunction decision. We address each argument in turn.

### A.     *Eighth Amendment Claim*

To state a plausible claim for relief under the Eighth Amendment, a plaintiff must plead "a substantial risk of serious harm, an

objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." *Baze v. Rees*, 553 U.S. 35, 50 (2008) (internal quotation marks omitted).  The Eighth Amendment inquiry focuses on whether the state's chosen method of execution "cruelly superadds pain to the death sentence" by asking whether the state has "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019).

Smith argues that the district court erred in denying his request for a preliminary injunction because he is likely to succeed on his Eighth Amendment claim.  Smith asserts that the Protocol as developed by ADOC fails to ensure an airtight seal and would allow oxygen to infiltrate the mask.  This oxygen infiltration while nitrogen is being pumped into the mask could lead to a persistent vegetative state, stroke, or suffocation.  Smith also argues that his exposure to high levels of nitrogen, which may cause nausea, in combination with his documented chronic nausea induced by his PTSD from his prior execution attempt, could lead to him vomiting and asphyxiation.  Finally, Smith argues that he has identified feasible and readily available alternative methods to ADOC's protocol.

To demonstrate that a risk of harm violates the Eighth Amendment, the petitioner must show the conditions leading to the risk are "*sure* or *very likely* to cause serious illness and needless suffering," and will cause "*sufficiently imminent* dangers."  *Helling v.*

*McKinney*, 509 U.S. 25, 33–34 (1993) (emphasis added).  There must be a "substantial risk of serious harm," also considered an "objectively intolerable risk of harm," that negates any contention by prison officials that they qualify as "subjectively blameless" under the Eighth Amendment.  *Farmer v. Brennan*, 511 U.S. 825, 842, 846, & n.9 (1994).  Further, the petitioner must show that its alternative method "would significantly reduce a substantial risk of severe pain.  A minor reduction in risk is insufficient; the difference must be clear and considerable."  *Bucklew*, 139 S. Ct. at 1130 (internal citation omitted).

Supreme Court precedent is clear that a new method of execution does not automatically establish a claim for cruel and unusual punishment.  *See id.* at 1123–24 (discussing the shift to electrocution and how that was not considered cruel in the constitutional sense); *Glossip*, 576 U.S. at 881–86 (discussing the changes in lethal injection drugs and how those changes do not amount to cruel and unusual punishment); *Baze*, 553 U.S. at 50–51 (addressing lethal injection for the first time and finding it not to be cruel and unusual).  There is no doubt that death by nitrogen hypoxia is both new and novel.  Because we are bound by Supreme Court precedent, Smith cannot say that the use of nitrogen hypoxia, as a new and novel method, will amount to cruel and unusual punishment in violation of the Eighth Amendment by itself.  Rather, Smith must show why this method will cause him "a demonstrated [substantial] risk of severe pain." *Glossip*, 576 U.S. at 878.  Smith must also "show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that

[Alabama] has refused to adopt without a legitimate penological reason." *Bucklew*, 139 S. Ct. at 1125.

Here, the district court was tasked with conducting factual findings for the first new method of execution in over 40 years. The district court boiled Smith's arguments down to three:

> (1) use of an off-the-shelf mask, as opposed to some other device such as a hood, subjects Smith 'to a substantial risk of oxygen infiltration'; (2) the specific mask the ADOC intends to use for Smith's execution 'will permit the entertainment of room air' resulting in a substantial risk of superadded pain short of death; [and] (3) the Protocol itself, and Smith's individual circumstances—now suffering from PTSD and depression as a result of the failed lethal injection execution attempt and his looming execution—subjects him to a "substantial risk of asphyxiation on his own vomit."

After an analysis of expert testimony, various supporting exhibits, and the mask apparatus, the court held:

> What the testimony from the experts shows, if anything from an overall standpoint of consistency, is that the uninterrupted introduction of pure nitrogen will result in nitrogen hypoxia and that nitrogen hypoxia will ultimately lead to death. On this record, there is simply not enough evidence to find with any degree of certainty or likelihood that execution by nitrogen hypoxia under the Protocol is substantially

likely to cause Smith superadded pain short of death
or a prolonged death.

After a thorough review of the underlying record, and in light of
our highly deferential standard of review, we are bound to agree
with the district court's factual findings. We address the district
court's findings surrounding the likelihood of vomiting and oxygen
infiltration in turn.[4]

Our deferential standard of review does not support a find-
ing that the district court's determination that Smith is not substan-
tially likely to vomit during the execution is clearly erroneous. The
district court found that "[t]he record still lacks evidence demon-
strating when, where, or how much Smith might vomit during the
execution, with or without the mask on, before or during the ad-
ministration of nitrogen." The district court noted that Smith's ex-
perts testified that Smith is likely to vomit during the execution
based on the medical records. But even with that information, the
district court balanced this testimony against the Defendants' alter-
ation of when Smith will receive his last meal, prohibiting solid
food intake for over eight hours before his scheduled execution.
This was similar to one of Smith's suggested remedies to the Pro-
tocol to reduce the substantial risk of harm. Because there is no
evidence that Smith is likely to vomit at the moment in which ni-
trogen is introduced into the mask, we cannot say that the district

---

[4] As we noted above, this case has been back to the district court for further
review, so the district court's factual finding on whether Smith is likely to
vomit comes from the district court's January 24, 2024 order.

court erred in finding that Smith would not be at substantial risk of harm from choking on his vomit during the execution.

We are similarly bound by the district court's factual findings surrounding a substantial risk of oxygen infiltration. The district court found that:

> Given its design, the court finds it highly unlikely the mask would dislodge or that the seal would be broken and outside air introduced if it is tightly secured on the condemned inmate's head in a positive pressure environment, even under the scenarios Smith alleges could break the seal—like audibly speaking or moving his mouth or head.

After a painstaking review of the underlying record, we cannot say this conclusion is a clear error. Diagrams and testimony about the mask's design confirm that its five straps securely fit the mask across the entire face, with the entire assembly enveloping the wearer's head. Videos demonstrate the condemned will be strapped to a gurney with limited mobility[5] and, coupled with the mask's design, it is not clearly erroneous to find it "highly unlikely" the mask will dislodge. Even if the mask is an imperfect fit, the footage exhibits an unsecured mask that, when pumped with a

---

[5] Alabama provided video evidence of volunteers who wore the mask, while strapped to the gurney and spoke while breathing oxygen through the apparatus. We note that this evidence has limited relevance given the vastly different circumstances the condemned faces—a second execution, by a novel method, through the use of an inert gas.

high volume of nitrogen, creates a rapidly hypoxic environment over the course of 45 seconds.  Taken together, it is not clearly erroneous to conclude that the mask will be adequately sealed to create sufficiently severe hypoxic conditions that, according to expert testimony, will lead to unconsciousness within seconds.  Based on this record, we cannot say the mask is "sure or very likely to" dislodge or permit enough oxygen to infiltrate to create a substantial risk of severe pain.  *See Helling*, 509 U.S. at 33–34.

In *Glossip*, the Supreme Court reiterated that "prisoners cannot successfully challenge a method of execution unless they establish that the method presents a risk that is '*sure or very likely* to cause serious illness and needless suffering' and give rise to '*sufficiently imminent* dangers."  576 U.S. at 877 (quoting *Baze*, 553 U.S. at 50).  When the district court assessed Smith's claim, it discussed that most of Smith's claims are predicated on "a cascade of unlikely events."  And considering the underlying factual findings, which are not clearly erroneous, Smith is unable to meet the high standard that Eighth Amendment jurisprudence requires.[6]

We are bound by this record to hold the district court did not clearly err in its substantial risk of serious harm findings.  Because Smith's claim fails on this prong, his Eighth Amendment

---

[6] We also note that in *Glossip*, when confronted with little evidence about the use and effects of midazolam, the Supreme Court explained that the inmate "bear[s] the burden of persuasion" even if there is a "dearth of evidence."  576 U.S. at 881–84.  The lack of evidence here on the effects nitrogen hypoxia will have on Smith makes it impossible for us to reverse.  *Glossip* ties our hands.

claim must fail.[7]  We consequently must affirm the district court on its Eighth Amendment holding.

### B.    RLUIPA

Under RLUIPA, "[n]o government shall impose a *substantial burden* on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a) (emphasis added).  In practice, the person challenging a policy under RLUIPA bears the initial burden of proving that said policy implicates and substantially burdens his or her religious exercise.  *Holt v. Hobbs*, 574 U.S. 352, 360 (2015).  Once that burden is met, the burden shifts to the government, which then must prove that (1) the policy is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.  *Id.* at 362.

---

[7] We do not address Smith's alternative methods.  But we do want to note that the district court improperly latched on to Alabama's "veritable blueprint" argument when it faulted Smith's proposed amendments as "far from providing a feasible, readily implemented alternative nitrogen hypoxia protocol with his list of proposed amendments."  But the district court overstates Smith's "feasible" and "readily implemented" requirement and misreads the holding in *Nance v. Ward*, 597 U.S. 159 (2022).  The Supreme Court did not state "that a condemned person proposing an alternative method of execution must provide a veritable blueprint for carrying the death sentence out."  Rather, this language comes from a factual analogy of that inmate's proposal—not from a new legal standard.  *See* 597 U.S. at 169.

Congress enacted RLUIPA "to provide very broad protection for religious liberty" by subjecting the State to strict scrutiny whenever it "substantially burdens [a prisoner's] religious exercise." *Id.* at 356 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)). Under RLUIPA, the term "religious exercise" broadly "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Audible prayer has been recognized by the Supreme Court as a form of religious exercise with a rich history in the United States. *See Ramirez v. Collier*, 142 S. Ct. 1264, 1278–79 (2022).

Here, Smith argues that the Protocol substantially burdens his ability to audibly pray during the course of his execution because he faces an untenable choice—audibly pray or face a substantial risk of superadded pain or prolonged death due to a dislodged mask. It is not speculative that Smith would engage in religious exercise because he both audibly prayed and sang the contemporary hymn "I Am Not Alone" during his failed execution. However, we cannot say that the district court clearly erred when it found that any risk of the mask gaping or dislodging is speculative based upon the same factual findings regarding the mask's design, fit, and nitrogen volumes above. Without such findings, we cannot conclude that Smith will be substantially burdened in his ability to audibly pray during the course of the execution. Based upon this standard of review, we are bound to accept the district court's findings as to Smith's claim and affirm the district court on its RLUIPA holding.

## C. Evidentiary Issues

Lastly, Smith asserts that the district court abused its discretion in denying his motion to strike Dr. Antognini's opinion, and failing to respond, thus implicitly denying, his motion to compel information predating ADOC's adoption of the current protocol.

We typically review evidentiary issues for abuse of discretion. *Harrison v. Culliver*, 746 F.3d 1288, 1297 (11th Cir. 2014). But we also have an obligation to review sua sponte whether we have jurisdiction at any point in the appellate process. *See Reaves v. Sec'y, Fla. Dep't. of Corr.*, 717 F.3d 886, 905 (11th Cir. 2013).

Generally, interlocutory discovery orders are not immediately appealable. *Doe No. I v. United States*, 749 F.3d 999, 1004 (11th Cir. 2014). And we find that the district court's order did not resolve Smith's motion to compel information predating ADOC's adoption of the current protocol. Because there is nothing for us to review, we lack jurisdiction. *Cf. Kaimowitz v. Orlando*, 122 F.3d 41, 43 (11th Cir. 1997) (per curiam).

As to Smith's motion to strike Dr. Antognini's opinion, the district court overruled the objections as it related to Dr. Antognini, explaining that he would take Smith's arguments "into consideration as it concerns the weight and credibility." Although still uncertain about whether the motion has been resolved, we assume that the district court's discussion at the hearing denied the motion. Even though discovery orders are typically not appealable, we may review such an order if it is "inextricably intertwined" with an issue before the court. *Jones v. Fransen*, 857 F.3d 843, 850 (11th Cir. 2017).

Dr. Antognini's opinion goes directly to several of the issues in the preliminary injunction, including the mask fit and whether it would dislodge during use.

Thus, we have jurisdiction to review the district court's decision denying Smith's motion to strike Dr. Antognini's opinion. Turning to the merits, the district court has wide discretion on evidentiary rulings. *Harrison*, 746 F.3d at 1297. "[W]e will not overturn discovery rulings unless it is shown that the District Court's ruling resulted in substantial harm to the appellant's case." *Iraola & CIA, S.A. v. Kimberly–Clark Corp.*, 325 F.3d 1274, 1286 (11th Cir. 2003) (internal quotation marks omitted). Smith's argument focuses on Dr. Antognini's review of the system at Holman, tests involving the system, and how it was unfair that he was not privy to this information. But as Alabama notes, Smith's main argument involves the type of mask and how it could possibly dislodge. Smith's expert, Dr. Nitschke, inspected the mask and provided his opinion on whether it could become dislodged, as did Dr. Antognini. Smith deposed Dr. Antognini about the opinion[8] and had the opportunity to cross-examine him at the evidentiary hearing. Thus, the district court did not abuse its discretion in allowing Dr. Antognini's opinion.

---

[8] Smith does note that he received Dr. Antognini's opinion late the night before Dr. Antognini's deposition. We appreciate the expedited nature of this case and the balancing of confidential information, but we are concerned and disheartened that Alabama's Office of the Attorney General would wait until late the night before a deposition to provide an expert opinion report, especially one that was hired before the start of this litigation.

## IV.    Motion to Stay Execution

The standard governing a stay of execution mirrors that for a preliminary injunction: the movant must establish a substantial likelihood of success on the merits. *See Valle v. Singer*, 655 F.3d 1223, 1225 (11th Cir. 2011) (per curiam).  For the reasons we have discussed above, Smith has failed to show a substantial likelihood of success on the merits of his claims.  Accordingly, his motion for a stay of execution is due to be denied without regard to the other prerequisites for the issuance of the same.

**AFFIRMED.**

24-10095              Wilson, J., Concurring              1

WILSON, Circuit Judge, Concurring:

The Supreme Court has recognized that death is not painless, and an execution that causes pain "by accident or as an inescapable consequence of death" does not constitute a risk which rises to an Eighth Amendment violation. *Baze v. Rees*, 553 U.S. 35, 50 (2008). But the Eighth Amendment does prohibit an execution that would amount to cruel and unusual punishment. *Id.* at 51. With that in mind, Smith may not be constitutionally guaranteed a painless death, but I have concerns that these circumstances may rise to a cruel and unusual execution.[1]

My first apprehension concerns what would occur if Smith were to vomit after nitrogen has been turned on, because ADOC has no protocol to handle this situation. Instead, Cynthia Stewart-Riley, the ADOC Regional Director, testified that the execution team will do nothing if this were to happen, which could lead Smith to asphyxiating. And expert testimony established that if Smith were to vomit once nitrogen is introduced, Smith faces a likelihood of asphyxiating on his own vomit.[2]

---

[1] We have recognized that Alabama has a history of failed executions. *See Barber v. Governor of Ala.*, 73 F.4th 1306, 1317 (11th Cir. 2023) (Pryor, J. dissenting) ("Three botched executions in a row are three too many.").

[2] In Dr. Yong's supplemental declaration, he stated that if Smith is "in a reclined position, he will likely inhale vomit and asphyxiate, resulting in painful sensations of choking and suffocations or even death from asphyxiation."

2                       Wilson, J. Concurring                       24-10095

My second concern focuses on Smith's prior failed execution and subsequent litigation.  For context, I provide a truncated version of past events.

Before his first attempted execution,[3] scheduled for November 17, 2022, Smith repeatedly warned that Alabama would struggle—if not fail—to obtain IV access necessary to complete the lethal injection.  Smith alleged that Alabama's lethal injection protocol would subject him to an Eighth Amendment method-of-execution claim, pointing to evidence of Alabama's recent mishandling of condemned inmates with similar difficulties.[4]  Smith argued that Alabama recently deviated from its execution protocol twice and would likely do so again.  The district court denied Smith's motion, but we reversed, finding that he pled sufficient facts to plausibly support his Eighth Amendment claim.  On November 17, 2022, at approximately 8:00 PM CST, we unanimously granted Smith's

---

[3] If Smith were to be convicted and sentenced today, he would be ineligible for the death penalty. The jury in his capital murder case recommended a sentence of life imprisonment—by a vote of 11 to 1.  A single judge had the power override the reasoned decision of a jury Smith's peers and impose the death penalty himself.  Judges no longer have this power, as the Supreme Court has since held that this sort of unilateral sentencing scheme violates criminal defendants' Sixth Amendment right to trial by jury. *Hurst v. Florida*, 577 U.S. 92, 94 (2016).  Pertinent here, Smith's conviction predates *Hurst*'s mandate.

[4] In July 2022, Alabama executed Joe Nathan James.  James was behind closed curtains for over three hours as the execution team sought to gain IV access. In September 2022, Alabama attempted to execute Alan Eugene Miller.  Miller was strapped to a gurney for two hours, his arms outstretched over his head, while the execution team attempted to gain IV access.

request for stay of execution. Before the stay was entered, Alabama took Smith to the execution chambers. The execution team strapped Smith to a gurney in the chamber while Alabama sought to vacate this court's stay of execution with the United States Supreme Court. And at approximately 10:00 PM CST, the Supreme Court vacated the stay without explanation. When Alabama's execution team attempted to gain IV access, Smith explained that "[the IV Team] began repeatedly jabbing Mr. Smith's arms and hands with needles, well past the point at which the executioners should have known that it was not reasonably possible to access a vein." As Smith predicted, Alabama was unable to obtain IV access, and at 11:30 PM CST Alabama called off the execution.

Smith filed an amended complaint to include allegations from his failed execution. He asserted that a second execution would constitute cruel and unusual punishment and violate his equal protection rights. Alabama moved to dismiss the complaint, but this time, the district court allowed Smith's Eighth and Fourteenth Amendment claims to proceed, noting that:

> [Smith's] allegations, which must be assumed true at this stage, go well beyond merely being pricked subcutaneously over a brief period in an attempt to establish an IV line. Rather, Smith's allegations support a plausible claim of cruel superadded pain as part of the execution, as multiple needle insertions over the course of one-to-two hours into muscle and into the collarbone in a manner emulating being stabbed in the chest, in combination with being strapped to the gurney for up to four hours and at one point being

placed in a stress position for an extended period of time, goes "so far beyond what [is] needed to carry out a death sentence that [it] could only be explained as reflecting the infliction of pain for pain's sake." Moreover, given Smith's allegations that he himself experienced severe pain during a prior execution attempt, and that the prior execution attempt was the latest in an ongoing pattern of the State's difficulties in establishing venous access when attempting to carry out lethal injection executions, it is plausible, rather than merely possible, that a second lethal injection execution poses a substantial risk of severe pain to Smith.

The district court directed the parties to develop a case management report under Rule 26 to begin the discovery process. The district court entered a scheduling order and set a deadline for initial disclosures. The next day (four days before the initial disclosures' deadline), Alabama moved to dismiss because John Hamm, Commissioner of ADOC, determined that nitrogen hypoxia would be an available method of execution. He also affirmed that lethal injection would not be used in any future attempts to execute Smith. Smith's counsel agreed with the injunction to prevent a second execution by lethal injection. However, he objected to the use of nitrogen hypoxia, as Alabama only provided Smith—and the court—with a heavily redacted version of their proposed protocol and sparse detail on how the execution would work in practice. Nonetheless, the district court granted Alabama's motion to

dismiss and entered a permanent injunction barring Alabama from using lethal injection to execute Smith.

But as our opinion explains, the standard of review governs our determination on whether the district court made clearly erroneous factual findings. Clear error mandates that "[if] the district court's view of the evidence is plausible in light of the entire record, an appellate court *may not reverse* even if it is convinced that it would have weighed the evidence differently in the first instance." *Barber v. Governor of Ala.*, 73 F.4th 1306, 1317 (11th Cir. 2023) (quoting *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021)) (emphasis added). And, for Smith to prevail, he must show that those factual findings are clearly erroneous. Like our opinion notes, Smith has failed to meet this demanding burden. Thus, I must concur.

24-10095                JILL PRYOR, J., Dissenting                1

JILL PRYOR, Circuit Judge, Dissenting:

The State of Alabama seeks to test an entirely new method of execution on Kenny Smith, opting for him to die not by lethal injection, but by nitrogen gas. Alabama proposes to do so even though its new nitrogen gas protocol has never been tested and despite real doubts about the protocol's ability to safeguard a condemned person's constitutional rights. And—critically, as I view this case—Alabama has chosen this condemned person, this protocol, and this moment, even though Mr. Smith is suffering mentally and physically from the posttraumatic stress Alabama caused when it botched its first attempt to execute him in 2022.

What is all of this likely to look like when the time comes for Mr. Smith to face his death again? He will be escorted by his executioners to the same execution chamber that was previously used for the first attempted execution. Inside the chamber, he will be strapped to a gurney, the same one that held him for hours as he endured excruciating pain just over a year ago. Nitrogen gas will begin to flow into the mask. Under these conditions Mr. Smith's undisputed posttraumatic stress disorder, which no one contests is causing him to persistently vomit, will be at its absolute peak. At the same time, he will experience oxygen deprivation, a known effect of which is vomiting. If Mr. Smith vomits, his executioners will not intervene—they have told us so—even as vomit fills the mask and flows into Mr. Smith's nose and mouth. Then, at last, Mr. Smith's body will succumb to the effects of oxygen deprivation,

asphyxiation, or both. He will die. The cost, I fear, will be Mr. Smith's human dignity, and ours. *See Hall v. Florida*, 572 U.S. 701, 708 (2014).

The Supreme Court has imposed a high bar on a condemned person seeking to prove that his impending execution will violate the Eighth Amendment's guarantee against cruel and unusual punishment. He must show that "the risk of pain associated with the State's method is substantial when compared to a known and available alternative." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019) (internal quotation marks omitted). The district court found that Mr. Smith had satisfied neither the substantial risk part of the test nor the known and available alternative part. As for the known and available alternative part, the district court legally erred in applying a "veritable blueprint" standard. *See* Maj. Op. at 22 n.7. Without addressing Mr. Smith's proposed amendments to the nitrogen gas protocol, I would hold that he has identified firing squad as a known and available alternative.

I part with the majority opinion because I believe the district court clearly erred in its factual findings regarding the substantial risk part of the Supreme Court's Eighth Amendment test. The district court said Mr. Smith's claim that he is likely to vomit during the execution while nitrogen is flowing is "possible only upon the occurrence of a cascade of unlikely events." But the record shows that Mr. Smith is likely to vomit, both because of the undisputed effects of oxygen deprivation and because of the undisputed activation of his posttraumatic stress disorder from the first botched

execution attempt, of which his persistent vomiting is a documented symptom. Because no one will intervene if he vomits, his vomit will flood his face, both nose and mouth. And the record reflects that when a person inhales vomit and asphyxiates, he experiences "painful physical sensations of choking and suffocation." As I see it, this cascade of likely events is, in turn, likely to prolong or superadd pain and suffering to Mr. Smith's death. I view the district court's findings of fact otherwise as clearly erroneous. And given the record evidence about the effects of this execution on this individual, I would conclude that Mr. Smith has shown a substantial likelihood of success on the merits of his Eighth Amendment claim, and I would not allow his execution to proceed.[1]

 Respectfully, I dissent.

---

[1] Because I would enjoin Mr. Smith's execution on Eighth Amendment grounds, I would not reach his remaining claims in this appeal.